**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Orville Leon PAYNE,
Defendant–Appellant.**

**Nos. 79–2393, 79–2561.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1980.

Decided Dec. 10, 1980.

Rehearing and Rehearing En Banc
Denied Feb. 2, 1981.

John D. Clouse, Michael C. Keating, Evansville, Ind., for defendant–appellant.

Charles Blau, Asst. U. S. Atty., Indianapolis, Ind., for plaintiff–appellee.

Before PELL and CUDAHY, Circuit Judges, and DUMBAULD,* Senior District Judge.

DUMBAULD, Senior District Judge.

Appellant was convicted (under the general conspiracy statute, 18 U.S.C. § 371)[1] of conspiring to cause transportation of stolen motor vehicles from Kentucky to Indiana in violation of 18 U.S.C. § 2312[2] and to receive, conceal, and sell such vehicles in violation of 18 U.S.C. § 2313.[3] Of nineteen overt acts alleged, nos. 11–15 were withdrawn from consideration by the jury. Eleven other counts involved other defendants and included one charge of conspiracy and ten charges of violation of 18 U.S.C. §§ 2312 and 2313. Appellant was named only in Count I, charging conspiracy with Jon Scott, Gary Surber and other persons known and unknown. When the case went to the jury the other defendants had been permitted to enter guilty pleas and appellant was the only remaining defendant. Overt acts nos. 16–19 relate to acts occurring in May, 1978, within the five year[4] period before August 22, 1979, when the indictment was returned. The other overt acts involved took place between January and May, 1974. Appellant advances several

---

\* The Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

1. "If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. "Whoever transports in interstate or foreign commerce a motor vehicle . . ., knowing the same to have been stolen, shall be fined not

more than $5,000 or imprisoned not more than five years, or both."

3. "Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle . . ., moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen shall be fined not more than $5,000 or imprisoned not more than five years, or both."

4. A five year statute of limitations applies. 18 U.S.C. § 3282.

contentions why his conviction should be reversed.

■ 1. *Statute of limitations.* It is argued that each stolen vehicle was the subject of a separate conspiracy and that the overt acts in 1978 could not reactivate a conspiracy dormant since 1974.

But the evidence showed that the nature of the arrangement between the conspirators was that Hines and Scott would steal cars "to order" in conformity with the needs and requirements of appellant's business. Appellant provided the market or demand, while his co–conspirators handled the "supply side" and furnished stolen cars of the make and model ordered. Appellant preferred buying from an out–of–town source (the "chop shop" operated by Hines was in Louisville, Kentucky) and also required delivery of purchased stolen vehicles at a farm implement store five miles away rather than directly to his own place of business. He supplied his customers the stolen vehicles together with titles and vehicle identification numbers from total loss vehicles purchased as salvage from insurance companies. Hence the stolen car and the description of the salvage car had to match, and appellant would give Hines orders for particular makes and models as needed.

In May, 1978, appellant wanted a Ford truck to be used in repairing a garbage truck which appellant had purchased. Hines supplied appellant with a stolen Ford furniture truck. The stolen Ford was not driven to appellant's place of business under its own power, but was cut up into pieces which were loaded on a Chevrolet truck owned by Hines and delivered to the destination specified by appellant. These transactions were recited in overt acts nos. 16–19.

This Court has held that the duration and identity of a conspiracy depends upon its terms. *U. S. v. Nowak*, 448 F.2d 134, 139 (7th Cir. 1971). In the case at bar it is clear that the parties contemplated a continuing relationship of demand and supply, depending upon the current needs of appellant's business. Periods of dormancy could exist between transactions without disrupting or terminating the arrangement. The situation was similar to that which would exist if a manufacturer and a chain store conspired to violate the Robinson–Patman Act by giving and receiving prohibited discounts, but long periods of time might elapse between orders placed with the manufacturer. As another example, a national bank and its director might agree to make prohibited loans to the director, to be used in furtherance of his speculations on the stock market. Here too, long periods of time might elapse between one loan and the next, depending upon the exigencies of the borrower's requirements.

■ Appellant also argues that transportation of stolen truck *parts* across a state line does not constitute the forbidden transportation of a stolen *motor vehicle* across a state line. As the renowned Dean Roscoe Pound of the Harvard Law School once said to the writer of this opinion during a moot–court case, "That argument is ingenious but does not hold water."

We are not talking about transportation of replacement parts, manufactured as a separate item, independent of the entire motor vehicle. We are dealing with parts which were once constituent portions of a total vehicle, and which have been severed therefrom by participants in a criminal enterprise.

It would contravene and frustrate the policy of the Dyer Act and the intent of Congress in enacting it if car thieves could escape prosecution by taking the simple precaution of cutting the vehicles up into pieces. *U. S. v. Shanks*, 521 F.2d 83, 85–86 (7th Cir. 1975). The testimony in the case at bar shows that appellant's dealings related to entire vehicles on a large scale. He did an annual business of $180,000; he was not a petty peddler of stolen hub caps.

By analogy, common sense teaches that if it were illegal to transport in interstate commerce chickens infected with certain diseases or game killed in violation of conservation laws, a defendant could not thwart the law by packaging legs and

breasts separately, or dismembering a deer killed out of season.

■ 2. *Right to counsel.* Appellant also advances a number of procedural points. It is argued that he was deprived of his right to counsel because two of his three attorneys withdrew in order to represent co–defendant Surber, and then were not permitted to resume representation of appellant after Surber decided to plead guilty. The Court thought Surber might be called as a Government witness, but he was not.

The arrangement that appellant's two original attorneys should not continue to represent him but should represent Surber was consented to by appellant, after consultation with counsel.

We cannot say that the Sixth Amendment was violated. Appellant was adequately represented by counsel of his choice. He did not diligently demand, after Surber decided to plead, that the two lawyers who had represented Surber return to .is defense. Perhaps no real harm to the orderly conduct of proceedings would have resulted if such a demand had been made and granted, but we cannot say that the trial court abused its discretion in maintaining the status quo and proceeding in accordance with the previously agreed upon arrangement which appellant had accepted.

The basic factor in conflict of interest situations is to ensure that each defendant receives independent advice based upon his own self–interest rather than advice which may be predominantly dictated by the interest of other defendants.

The classic case is presented by the situation of corporate executives and employees called before a grand jury in an antitrust proceeding. If the company lawyer represents them all, it would save expense and no harm would result if all the potential defendants are *in pari delicto.* But if some of them are mere underlings involved only peripherally in the offenses under investigation, and have been summoned or indict-

ed merely with the hope that pressure to cooperate with the Government may be brought to bear upon them, then there may well come a time when such a peripherally involved participant may find it to his advantage to become a tattletale and accept the Government's offer of immunity or leniency. In making this crucial decision he is entitled to legal advice evaluating the situation from the standpoint of his own individual interests, rather than advice that may be tainted by consideration of the interests of other (more important or lucrative) clients of the lawyer. Such independent protection of the interests of each client is assured by their representation by separate counsel. Appellant in the case at bar agreed to such an arrangement, and received the benefits of it. There has been no prejudice to his constitutional rights.

■ 3. *Mistrial.* Appellant argues that a mistrial should have been declared when the six other defendants in the case decided to plead guilty, leaving appellant as the only defendant remaining to put himself upon the country. It is plain that this contention is untenable.

The trial court clearly explained to the jury that the trial would be limited to issues arising under Count I of the indictment and that the jury's task would be to determine the guilt or innocence of appellant under the allegations of that count.

The weakness of this argument is shown by the fact that it was not urged at the trial, as counsel candidly concedes (Brief, p. 34), but feebly and vainly asserts that it involves fundamental error and that the trial court should have declared a mistrial *sua sponte.* We find no merit in this contention.

■ 4. *Impeachment of witnesses.* A character witness for defendant was called to testify regarding appellant's reputation for honesty and being a law–abiding citizen. Upon cross–examination the witness was asked if he knew of appellant's conviction [5]

---

**5.** The conviction was subsequently reversed on appeal, but both sides agree that that circumstance is immaterial.

in state court for unlawfully selling an automobile, the identification number of which had been removed; and if so whether that would change his opinion as to appellant's reputation. The witness responded in the negative to both questions.

It seems clear that the trial judge was correct in holding that the defense had "opened the door" to this line of inquiry by putting in issue appellant's reputation for the traits of truthfulness and law–abiding citizenship. Rule 405(a) of the Federal Rules of Evidence expressly permits cross–examination with respect to specific instances of conduct.[6]

It is significant that appellant raised no objection at the trial to these questions. The court also charged with clarity that evidence of other offenses could not be considered as any proof whatsoever of appellant's guilt of the charge upon which he was being tried.

A defense witness denied knowing a police detective seated at counsel table who was pointed out to him. The detective happened to have been the arresting officer when the witness was convicted in Indiana earlier in the year for carrying a pistol without a permit after being stopped for "tailgating" another truck. The trial judge correctly ruled that to follow up the statement of the witness by testing his recollection it was proper to ask if he had been convicted in Indiana during the twelve months last past.

5. *Exclusion of evidence.* Appellant complains of exclusion of evidence that in Detroit on a dozen or so occasions[7] he bought automobiles at a substantial discount from "redbook" value.

Market prices in Detroit would seem to have dubious relevance to prices at a different time and place. Prices of cars coming to Indiana from Kentucky would seem to constitute the pertinent market in the case at bar.

The only purpose of the proffered prices was to negate the inference that defendant knew he was buying "hot merchandise" or stolen cars because the price he paid was less than the "redbook" value of the cars purchased. The weakness of that inference could adequately be dealt with in argument to the jury without proof of what prices in Detroit might have been at some other time. There was abundant evidence in the record from which the jury might have drawn a more solid inference of appellant's guilty knowledge: such as his discussion of a "better way" to rebuild damaged cars (by substituting other cars in their place and supplying titles and identification numbers from the salvaged cars); his unwillingness to buy from local sources since they "would steal them right down the road" close to his place of business; and his unwillingness to take delivery of purchased cars at his place of business during business hours.

Exclusion of the Detroit prices was harmless, even if the evidence was regarded as remotely relevant, and was properly excluded under Rule 403 as its probative value was substantially outweighed by its tendency to cause confusion or undue delay and waste of time at the trial. The trial court did not abuse its discretion in excluding the proffered evidence.

For the foregoing reasons the judgment of the District Court is affirmed.

---

**6.** It is also debatable whether removal of a vehicle identification number involves "dishonesty" *vel non.* Appellant's certitude that Rule 609(a) would exclude reference to such a conviction may be overly optimistic.

**7.** According to the Government's brief (p. 35) the exhibit offered showing prices paid in Detroit covered only five vehicles, and a period of time different from that involved in the indictment.